(No. 70693.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. BRODIE YOUNG, Appellant.

*Opinion filed December 4, 1992.*

CLARK and FREEMAN, JJ., took no part.

Randolph N. Stone, Public Defender, of Chicago (Stephanie L. Ellbogen, Assistant Public Defender, of counsel), for appellant.

Roland Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and David R. Butzen, Assistant State's

Attorneys, of counsel), for the People.

CHIEF JUSTICE MILLER delivered the opinion of the court:

The defendant, Brodie Young, was indicted by a Cook County grand jury for the murder of Yankel Rudminsky. After his extradition from Wisconsin on the charge, the defendant made post-arrest statements to Illinois law enforcement authorities concerning the murder. The defendant filed a motion to suppress the statements on the ground that they were elicited in violation of his fifth and sixth amendment rights under the United States Constitution to remain silent and to the assistance of counsel. The trial court granted the motion. The appellate court reversed that decision. (201 Ill. App. 3d 521.) We granted the defendant's petition for leave to appeal (134 Ill. 2d R. 315), and now affirm the appellate court.

## FACTS

On March 12, 1987, a fugitive warrant, approved by a Cook County assistant State's Attorney, was issued for defendant Brodie Young in connection with the murder of Yankel Rudminsky. At the time the warrant was issued, the defendant was in Wisconsin in violation of a $2,000 cash bond on an unrelated charge. Defendant was 17 years old.

On March 16, 1987, Lieutenant Robert Nelson of the Outagamie County, Wisconsin, sheriff's department received a teletype message regarding the outstanding warrant from the Chicago police department. Lieutenant Nelson then contacted Division 6, Violent Crimes, of the Chicago police department and spoke to Detective Larry Thezan. Detective Thezan informed Lieutenant Nelson that the Chicago police believed that the defendant was living with a relative in Oneida, Wisconsin, located in Outagamie County. After giving Lieutenant Nelson the

address, he asked that the Outagamie sheriff's department apprehend the defendant on the warrant. Lieutenant Nelson agreed to pick up the defendant the next morning.

On March 17, Lieutenant Nelson went to the address supplied by the Chicago police. He and another member of the sheriff's department took defendant into custody. Lieutenant Nelson then contacted Detective Thezan and informed him that the defendant was in custody.

Later that day, the Outagamie district attorney's office filed a petition for temporary physical custody of the defendant on the ground that he was a fugitive from Illinois. A hearing was scheduled for the same day. Defendant was represented by Michael Dally, an assistant State public defender for Outagamie County. The circuit court granted the petition.

Because the Wisconsin trial court had applied the wrong provision of Wisconsin's extradition statute, a second hearing was held on this matter the next day. Accordingly, the court vacated its previous order and entered a superseding order under a different section of the statute granting the district attorney's petition for temporary physical custody. Bail was set at $50,000 after evidence was introduced that the defendant had violated the terms of a $2,000 cash bond in an unrelated matter by leaving Illinois.

On June 9, 1987, defendant's attorney informed the Outagamie County circuit court that the defendant would waive extradition to Illinois. The court then ordered the sheriff of Outagamie County to comply with the terms of the warrant and to surrender the defendant to the Illinois law enforcement authorities.

At the conclusion of the proceedings, the defendant's attorney advised the court that the defendant was asserting, for the present and future, his right to remain silent and to the assistance of counsel under the fifth

and sixth amendments before any interrogation began. Defendant's attorney informed the court that defendant would be represented by the Cook County public defender's office. Counsel further stated that he was concerned the defendant would be coerced or subjected to duress on the return trip to Illinois in order to compel the defendant to make incriminating statements.

Defendant, when asked by counsel in open court whether he wished to assert his fifth and sixth amendment rights, responded "Right." Defendant's attorney then asked the Wisconsin trial court to inform the Illinois law enforcement authorities that defendant asserted his fifth and sixth amendment rights. Counsel further asked the court to enter an order for defendant to take with him directing the Illinois authorities to refrain from interrogating the defendant outside the presence of counsel.

The court agreed to enter the order, but noted that it might not be valid. The record does not indicate that any such order was ever entered by the court.

On June 12, 1987, after defendant had waived extradition, Chicago police Detective Thezan and his partner, Detective Yawger, went to Oneida, Wisconsin, to take the defendant into custody on the extradition order. Defendant does not claim that he was interrogated or questioned concerning the murder of Yankel Rudminsky before being transferred to the custody of the Chicago police officers.

Detectives Thezan and Yawger obtained custody of the defendant from the Outagamie sheriff's department. Neither Thezan nor Yawger was informed that the defendant had previously indicated that he wished to remain silent or that he had requested an attorney. No representative of the Outagamie County district attorney's office or the public defender's office was present when defendant was transferred to the Chicago authorities.

No order concerning the defendant's assertion of his rights was presented to the detectives.

With defendant in their custody, Detectives Thezan and Yawger began the drive back to Chicago. The defendant sat in the backseat. Shortly after leaving Oneida, Detective Thezan initiated a conversation with the defendant. Thezan asked the defendant if he knew what this was about. After receiving an affirmative reply, Thezan asked the defendant if he wanted to talk about the charge, and defendant said he did.

Thezan then read the defendant his *Miranda* warnings and asked the defendant if he understood each of his rights. The defendant replied that he did. The defendant then, in narrative form, gave the detectives incriminating statements concerning the victim's death.

After arriving in Chicago at approximately 7:30 p.m., the defendant was taken to an interview room at the police station. At 8 p.m. the defendant was again read his *Miranda* rights and again replied that he understood them. Detective Thezan and the defendant then talked about the murder of Yankel Rudminsky.

At approximately 11:30 that evening, the defendant was once again read his *Miranda* rights by Assistant State's Attorney Nick Trutenko. Detective Thezan was also present. The defendant indicated that he understood his rights. At no time while he was in the custody of the Chicago authorities did defendant request an attorney, state that he had an attorney whom he wanted present at any questioning or indicate that he wished to remain silent. Once again, the defendant made incriminating statements concerning the murder of Rudminsky.

The circuit court granted defendant's motion to suppress, finding that the defendant had effectively invoked his rights to remain silent and to counsel at the Wisconsin extradition hearing. The court further found that although the defendant invoked his rights to Wisconsin au-

thorities, knowledge of that invocation was imputed to the Illinois law enforcement authorities.

On appeal, the appellate court reversed. (201 Ill. App. 3d 521.) The court agreed that the defendant had invoked his *Miranda* rights in Wisconsin, but refused to impute knowledge of the invocation interstate to the Illinois authorities. The court also refused to impose a duty on the Illinois authorities to inquire whether defendant had invoked his fifth amendment right to counsel in Wisconsin. Accordingly, the court found that the defendant's fifth amendment rights were not violated. The appellate court also ruled that the defendant's sixth amendment right to counsel had not been violated.

The defendant now asks this court to reverse the appellate court and affirm the circuit court's order to suppress the statements made by him concerning the murder of Yankel Rudminsky.

## DISCUSSION

Several issues concerning defendant's assertion of his fifth and sixth amendment rights are presented in this appeal. The first issue is whether the defendant's assertion of his fifth and sixth amendment rights to the Wisconsin authorities should be imputed to the Chicago authorities such that the rule in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, prevented Illinois law enforcement authorities from initiating questioning. The second issue is whether the Illinois authorities had a duty to inquire of the Wisconsin authorities whether defendant had invoked his right to counsel in Wisconsin. The third and final issue is whether the defendant's sixth amendment right to counsel had attached at the time he was questioned by Illinois law enforcement authorities, and if so, whether that right was violated.

## Imputation of Knowledge

This court has held that in Illinois a State law enforcement authority's knowledge of an accused's invocation of his fifth and sixth amendment rights will be imputed to other law enforcement authorities within the State. (See *People v. Medina* (1978), 71 Ill. 2d 254; *People v. White* (1975), 61 Ill. 2d 288; *People v. Blanchard* (1967), 37 Ill. 2d 69.) The defendant, however, would have us extend our rule of intrastate imputation so that another State's knowledge of an accused's invocation of his rights would similarly be imputed to our law enforcement authorities. We decline to expand the scope of the imputation doctrine to the circumstances presented here.

One of the purposes of imputing knowledge between two law enforcement authorities within the same State is to prevent an accused's request for counsel from being circumvented by transferring custody of the defendant to another officer who is not aware the request. (*People v. White* (1975), 61 Ill. 2d 288.) The rule thus avoids "attempt[s] by police to avoid responsibility by dividing it among different individuals." *People v. Gabbard* (1979), 78 Ill. 2d 88, 98.

A second purpose of imputing knowledge between two law enforcement authorities within the same State is to give effect to the bright line rule of *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880. (See, *e.g., State v. Dampier* (1985), 314 N.C. 292, 333 S.E.2d 230; *McFadden v. Commonwealth of Virginia* (1983), 225 Va. 103, 300 S.E.2d 924.) *Edwards* held that once a suspect invokes his right to counsel all questioning must cease unless the defendant himself initiates further questioning. (*Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1885.) The rule in *Edwards* was "designed to protect an accused in police custody from being badgered by police officers in the man

ner in which the defendant in *Edwards* was." (*Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1044, 77 L. Ed. 2d 405, 411, 103 S. Ct. 2830, 2834 (plurality opinion); see also *Smith v. Illinois* (1984), 469 U.S. 91, 98, 83 L. Ed. 2d 488, 496, 105 S. Ct. 490, 494.) Imputing knowledge thus also serves to prevent the police from "badgering" a suspect into making a confession. *Dampier*, 314 N.C. 292, 333 S.E.2d 230.

The State relies on *People v. Warner* (1986), 146 Ill. App. 3d 370, to support its argument that knowledge should not be imputed in the instant case. In *Warner*, the defendant, a suspect in a 1977 murder in Illinois, fled Illinois to Florida. Approximately five years later, the Chicago police learned that the defendant was in Florida. They notified the FBI of the defendant's presence in Florida and of the existence of an arrest warrant. The defendant was subsequently arrested by the FBI.

The defendant was advised of his *Miranda* warnings and was then taken to the FBI's Miami office for processing. The defendant stated that he wanted to speak to a lawyer before questioning. The FBI refrained from asking any questions. The defendant was then turned over to the Florida authorities, where he was detained in a Florida prison.

The FBI did not notify the Chicago police of the defendant's arrest, but it did prepare a report summarizing its contact with the defendant. The report was only sent to the Chicago office of the FBI.

Approximately three months later, Chicago police officers went to Florida and returned the defendant to Illinois. Although the Chicago police received transfer documents from the Florida officials, they did not receive the FBI report. The defendant was given his *Miranda* warnings by the Chicago police officers, but he did not state

that he wanted the assistance of an attorney. No interrogation occurred on the trip to Illinois.

On return to Illinois, the defendant was again read his *Miranda* warnings. The defendant indicated that he understood his rights and agreed to speak to an assistant State's Attorney. During the interview, the defendant made incriminating statements. He then sought to suppress these statements on the ground that they were obtained in violation of his fifth amendment right to counsel, which he had invoked during his questioning by the Florida FBI.

The trial court denied the defendant's motion. The appellate court affirmed, refusing to impute knowledge of the defendant's exercise of his rights in Florida to the Chicago law enforcement authorities.

Our appellate court in *Warner* found that nothing in the record indicated that the FBI or Chicago authorities, either intentionally or unintentionally, engaged in conduct that attempted to circumvent the defendant's right to counsel by shifting him from one unit to another. (*Warner*, 146 Ill. App. 3d at 380.) Further, the court found that the facts did not present circumstances where the police, either unintentionally or intentionally, badgered or wore down the defendant in an attempt to persuade him to confess, notwithstanding his earlier request for counsel. *Warner*, 146 Ill. App. 3d at 380.

In the instant case, there is nothing in the record that would lead us to believe that transferring the defendant from the custody of the Wisconsin authorities to the Chicago police constituted an attempt to circumvent the defendant's right to counsel by shifting him from one law enforcement agency to another. It seems equally clear that the purpose of the transfer was to complete the extradition process. Furthermore, nothing in the record indicates that the Chicago authorities wore down the defendant or badgered him into incriminating

himself despite his earlier request for counsel. (*Smith v. Illinois* (1984), 469 U.S. 91, 98, 83 L. Ed. 2d 488, 495-96, 105 S. Ct. 490, 494.) Because neither of the purposes for imputing knowledge is present in the case before us, we do not believe that the facts warrant imputing knowledge of the defendant's request for counsel from the Wisconsin authorities, to whom the request was made, to the Illinois authorities, who took custody of the defendant with no knowledge of the defendant's request.

*Warner* is consistent with our own analysis. The defendant, nevertheless, argues that *Warner* is distinguishable because in *Warner* there was a three-month delay between the time the defendant exercised his fifth and sixth amendment rights in Florida and the time he was questioned in Illinois. Because in the instant case there was only a three-day delay between the defendant's assertion of his rights and the questioning by the Illinois authorities, the defendant claims that *Warner* is distinguishable. We have concluded, however, that knowledge will not be imputed in the case before us because neither of the purposes for imputing knowledge is present. The factual distinction in *Warner* does not change our conclusion.

In support of his position that knowledge should be imputed interstate, as well as intrastate, defendant relies on *People v. Bates* (1985), 133 Ill. App. 3d 205, in which a defendant suspected of an Illinois murder voluntarily surrendered himself to Iowa law enforcement authorities. In *Bates*, the defendant indicated that he did not want to be questioned until he had spoken to his attorney. This information was not conveyed to the Illinois authorities. The defendant was then returned to Illinois. Although not questioned on the trip to Illinois, upon arrival he was read his *Miranda* warnings, indicated that he understood them and then gave an inculpatory statement to an assistant State's Attorney. The defendant

moved to suppress his statement, arguing that it was obtained in violation of his right to counsel that he had exercised in Iowa. The trial court denied the motion.

The appellate court reversed. It found that the defendant had unambiguously invoked his right to counsel in Iowa. The court, relying on *Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490, found the defendant's unambiguous assertion of his right to counsel in Iowa to be the "dispositive" issue in the case. (*Bates*, 133 Ill. App. 3d at 207.) Because the court found *Smith* to be dispositive, it did not fully analyze the issue of imputation of knowledge. We do not, however, believe that *Smith* is controlling in the case before us. *Smith* reaffirmed *Edwards* and further explained what constituted a suspect's invocation of his right to counsel. We believe that the situation before us cannot be resolved by relying only on the Court's admittedly "narrow" decision in *Smith*. (*Smith*, 469 U.S. at 99, 83 L. Ed. 2d at 496, 105 S. Ct. at 494.) Because we believe neither *Edwards* nor *Smith* is dispositive on the question of imputation and because our analysis has led us to believe that knowledge should not be imputed interstate under the circumstances present here, defendant's reliance on *Bates* is misplaced.

Defendant also argues that Wisconsin and Illinois were engaged in a joint venture that required imputing knowledge from the agent, the Wisconsin authorities, to its principal, the Illinois authorities. Defendant argues that the Uniform Criminal Extradition Act (the Act), enacted in both Wisconsin (Wis. Stat. Ann. §976.03 (West 1985)) and Illinois (Ill. Rev. Stat. 1989, ch. 60, par. 18 *et seq.*), requires such close cooperation between the demanding State and the asylum State that the Wisconsin authorities acted as agents for Illinois. Defendant, however, cites no authority for this proposition.

"Extradition is not a matter of mere comity, but an absolute right of the demanding State and the duty of the asylum State. *In re Russell* (1974), 12 Cal. 3d 229, 524 P.2d 1295, 115 Cal. Rptr. 511; see also Ill. Rev. Stat. 1979, ch. 60, par. 19." (*People v. Siler* (1980), 85 Ill. App. 3d 304, 307; see also *People v. Boswell* (1986), 148 Ill. App. 3d 915, 917.) Thus although extradition requires cooperation between the demanding State and the asylum State, it is not a "joint venture," nor does it establish an agency and principal relationship between the cooperating States. Accordingly, we decline to impute knowledge on the basis of a "joint venture" theory.

Because we believe that neither of the purposes for imputing knowledge would be served in the case before us, we decline to impute knowledge from the Wisconsin authorities, to whom the request for counsel was made, to the Illinois authorities who took custody of the defendant with no knowledge of the defendant's request for counsel.

### Duty to Inquire

Defendant next contends that the Chicago police had a duty to inquire of the Wisconsin authorities whether the defendant had asked for the assistance of counsel. We disagree.

Defendant relies on *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093, in support of his claim that the Illinois authorities had a duty to inquire of the Wisconsin authorities whether defendant had exercised his right to counsel in Wisconsin before transporting the defendant to Illinois. For reasons which will be indicated, we do not find *Roberson* controlling.

In *Roberson*, the Supreme Court stated that custodial interrogation "must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation

to determine whether the suspect has previously requested counsel." (*Roberson*, 486 U.S. at 687, 100 L. Ed. 2d at 717, 108 S. Ct. at 2101.) The Court also stated that "whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists." *Roberson*, 486 U.S. at 687-88, 100 L. Ed. 2d at 717, 108 S. Ct. at 2101.

In *Roberson*, however, there was a written report of the defendant's exercise of his right to counsel. This report was available to the second officer who interviewed the defendant. That officer, however, failed to review the report and was therefore unaware that the defendant had previously invoked his right to counsel. Significantly, there was no such written record of the defendant's exercise of his rights in the case before us. There was only the defendant's assertion of his rights to Wisconsin authorities; defendant does not claim that the Wisconsin authorities who transferred custody to the Illinois authorities possessed any record of defendant's request for counsel.

Further, in *Roberson* the officer who conducted the second interrogation knew that the defendant was in police custody on a charge unrelated to the offense for which he wished to interrogate the defendant. That officer was apparently from the same State as the arresting officer to whom the defendant in *Roberson* communicated his request for counsel. He therefore knew or could reasonably have expected that the defendant had been questioned by the authorities on the unrelated charge and may have invoked his right to counsel. In the instant case, however, the Chicago police officers who took custody of the defendant had no expectation that the defendant had been questioned by the Wisconsin authorities concerning an Illinois crime or that he might have exercised his right to counsel in Wisconsin. An ex-

tradition hearing is only a summary and ministerial procedure for returning a fugitive to the demanding State so that he may stand trial. It is not a judicial inquiry into the merits of the charge. Moreover, because this was an Illinois crime and an Illinois investigation, the Chicago police would have no reason to believe that the defendant had been questioned by Wisconsin authorities concerning the offense. In fact, there is no indication in the record that the defendant was ever questioned by the Wisconsin authorities. Given the nature of the extradition hearing and the fact that the police had no reasonable belief that the defendant had been questioned by Wisconsin authorities concerning an Illinois crime, the Chicago authorities, unlike the second interrogating officer in *Roberson*, could not reasonably have expected that defendant had exercised his right to counsel in Wisconsin.

Because the second officer who interrogated the defendant in *Roberson* had access to a written report which indicated that the defendant had requested counsel, and because that officer had a reasonable expectation that the defendant may have exercised his right to counsel, we believe that *Roberson* is distinguishable from the instant case, where there was no written record of defendant's request for counsel and no reasonable expectation that defendant had invoked his right to counsel.

Further supporting this belief is the fact that there is no reason to believe that the Wisconsin authorities who transferred custody of defendant to the Illinois authorities had any record or information of defendant's in-court invocation of his right to counsel in Wisconsin. Thus even if the Illinois authorities who took custody of defendant had inquired of the Wisconsin authorities whether defendant had exercised his right to counsel, there is no reason to believe that they would have been provided with that information. Short of having the Illi-

nois authorities question every Wisconsin authority who came into contact with the defendant, imposition of a duty to inquire in this case would have been unavailing.

Our conclusion is also supported by *Alston v. State* (Del. 1989), 554 A.2d 304. In *Alston*, a defendant incarcerated in a pretrial detention facility signed a form provided by the public defender that indicated he did not wish to speak to any law enforcement authorities without a public defender present. Defendant retained one copy of the form, the second went to the public defender's office and the third went into a file for access by the detention facility's warden. Defendant was subsequently indicted and then taken to police headquarters for processing and further questioning. Defendant was read and waived his *Miranda* rights. Defendant then made incriminating statements. At trial, defendant motioned to suppress the statements, arguing that they were obtained after he had invoked his right to counsel by signing the form and therefore in violation of *Edwards*.

The Delaware Supreme Court rejected defendant's argument that the execution of the form constituted notice to the interrogating officer that defendant had invoked his right to counsel. The court recognized that *Roberson* refused to recognize ignorance resulting from an officer's lack of diligence as an valid excuse. The court, however, stated that the police records contained no reference to the defendant's execution of the form. The court then stated that: "We decline to view, as 'constructively known' to the police, records which are merely accessible to other state agents who function at the custodial level. Such a view places too heavy a burden on the police who acted in this case in good faith and without notice, actual or constructive, of Alston's [the defendant] *pro forma* claim to the assistance of counsel." *Alston*, 554 A.2d at 310.

Although phrasing its analysis in terms of "constructive knowledge," the court's reasoning is equally applicable to the case before us. In *Alston* there was a record of the defendant's request for counsel. This record was not readily available to the interrogating officer, as it was not in the immediate possession of the State agents who acted at the custodial level. Here, however, there is no claim that a record was made of defendant's assertion of his fifth and sixth amendment rights or that, if a record was made, it was in the possession of the Wisconsin authorities acting at the custodial level.

We therefore conclude that in the circumstances confronting us there was no reasonable procedure for the Chicago authorities to determine whether defendant had asserted his fifth and sixth amendment rights in open court in Wisconsin.

Although we believe no such reasonable procedure existed in the instant case, our analysis is not complete. In *Edwards*, as well as in *Roberson*, the focus was on the state of mind of the suspect, rather than the police. (*Roberson*, 486 U.S. at 687, 100 L. Ed. 2d at 717, 108 S. Ct. at 2101.) Defendant relies on the *Edwards* and *Roberson* focus to support his claim that *Edwards'* bright line rule should be applied in the instant case. He argues that once he had invoked his right to counsel in Wisconsin, all interrogation, even by police officers from another State who had no knowledge of the invocation, had to cease. The manner in which defendant asserted his right to counsel, however, does not support his conclusion.

Defendant's counsel, in open court, advised the Wisconsin trial court and the Wisconsin Outagamie County sheriff's department of defendant's invocation of his fifth and sixth amendment rights. Defendant's counsel then asked the Wisconsin trial court to advise the Chicago authorities of defendant's invocation of his right to counsel. He further asked the court to enter an order di-

recting the Wisconsin and Chicago authorities to refrain from questioning the defendant until counsel was present.

We do not believe that it was the responsibility of the Wisconsin trial court to inform the Chicago authorities, or for that matter the Wisconsin authorities, of defendant's assertion of his right to counsel. Further, although members of Wisconsin's Outagamie sheriff's department were present when defendant asserted his right to counsel, the assertion was made to the court and not to the law enforcement authorities who were there only in their custodial capacity.

Moreover, the record does not indicate that the order sought by the defendant was ever entered. Under these circumstances, we do not believe that defendant's assertion of his right to counsel should be afforded the protection of *Edwards'* bright line rule.

Finally, defendant asserted his right to counsel at the extradition hearing in Wisconsin. Defendant did not directly inform the Chicago and Wisconsin authorities of his assertion of the right to counsel nor does he claim that he followed through on the order directing those authorities to refrain from questioning him. Further, the Wisconsin trial judge indicated at the time defendant asserted his right that he was unsure whether the order sought by defendant would be valid. Given these circumstances, we do not believe that defendant expected that he would be entitled to the protection of *Edwards*.

Further supporting this conclusion is the fact that the Supreme Court has recognized two competing concerns that are implicated in custodial interrogations. One is "the need for police questioning as a tool for effective enforcement of criminal laws" and the second is the fact that custodial interrogation is "inherently coercive" and therefore exacerbates the risk that police may exert "constitutionally impermissible compulsion." (*Moran v.*

*Burbine* (1986), 475 U.S. 412, 426, 89 L. Ed. 2d 410, 424, 106 S. Ct. 1135, 1143.) In *Moran,* the Supreme Court stated that *Miranda* attempted to "reconcile these opposing concerns by giving the *defendant* the power to exert some control over the course of the interrogation." (Emphasis in original.) (*Moran,* 475 U.S. at 426, 89 L. Ed. 2d at 424, 106 S. Ct. at 1143.) There the Court held that defendant's waiver of his fifth amendment rights was valid despite police failure to inform defendant that counsel was attempting to contact him. The Court stated that holding otherwise would upset *Miranda's* reconciliation of the two opposing concerns "in a manner that [was] both unnecessary for the protection of the Fifth Amendment privilege and injurious to legitimate law enforcement." *Moran,* 475 U.S. at 427, 89 L. Ed. 2d at 424, 106 S. Ct. at 1144.

In the case before us, we realize that *Roberson* notes that *Edwards'* focus is on a defendant's state of mind. Nevertheless, we have concluded that no reasonable procedure existed to determine whether defendant had exercised his fifth and sixth amendment rights in Wisconsin and that defendant's assertion of his right to counsel was not effective in invoking the protection of *Edwards.* To alter our conclusion that *Roberson* and *Edwards* do not encompass the situation before us would, under the circumstances, be "unnecessary for the protection of the Fifth Amendment privilege and injurious to legitimate law enforcement." *Moran,* 475 U.S. at 427, 89 L. Ed. 2d at 424, 106 S. Ct. at 1144.

### Sixth Amendment Right to Counsel

The sixth amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right to \*\*\* have the Assistance of Counsel for his defense." (U.S. Const., amend. VI.) Unlike the fifth amendment right to counsel, the sixth

amendment right to counsel attaches when adversarial criminal proceedings have been initiated and the "defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural law." (*Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 418, 92 S. Ct. 1877, 1882 (plurality opinion).) It is at this point that the State has "committed itself to prosecute, and *** the adverse positions of government and defendant have solidified." *Kirby*, 406 U.S. at 689, 32 L. Ed. 2d at 418, 92 S. Ct. at 1882.

The guarantee of the sixth amendment arises " 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " (*United States v. Gouveia* (1984), 467 U.S. 180, 188, 81 L. Ed. 2d 146, 154, 104 S. Ct. 2292, 2297, quoting *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882 (plurality opinion).) The defendant has the sixth amendment right to counsel at all critical stages of his criminal proceedings. *United States v. Wade* (1967), 388 U.S. 218, 224, 18 L. Ed. 2d 1149, 1156, 87 S. Ct. 1926, 1931.

Defendant claims his sixth amendment right to counsel had attached before he was transferred to Illinois and that this right was violated when he was questioned without the presence of counsel. He argues that the issuance of the fugitive warrant and the filing of the preliminary complaint in Illinois to determine whether probable cause existed to formally charge him, as well as the extradition process in Wisconsin, was sufficient to trigger sixth amendment protection. It should be noted, however, that the complaint for preliminary examination was filed on June 15, 1987. This was three days after defendant had been questioned by Illinois law enforcement authorities and extradited to Illinois. Accordingly, the com-

plaint cannot be considered in determining whether the defendant's argument has merit.

We must now decide whether the issuance of a fugitive warrant and the extradition process triggered sixth amendment protection. We hold that it did not.

Defendant, relying on *Michigan v. Jackson* (1986), 475 U.S. 625, 89 L. Ed. 2d 631, 106 S. Ct. 1404 (applying *Edwards'* bright line rule to sixth amendment right to counsel analysis), alleges that the extradition process was an "arraignment or similar proceeding" that triggered sixth amendment protection. Before deciding if the extradition process is such a critical stage, we must first examine the nature of extradition proceedings.

In Illinois, the Uniform Criminal Extradition Act (Ill. Rev. Stat. 1989, ch. 60, par. 18 *et seq.*) governs the extradition of fugitives. Extradition is a summary and ministerial procedure for the purpose of returning a fugitive to the demanding State so that he may stand trial. (*Papas v. Brown* (1980), 88 Ill. App. 3d 471.) Because the purpose is only to return the fugitive to the demanding State, the only constitutional right involved is that of personal liberty. (*People ex rel. Shockley v. Hardiman* (1987), 152 Ill. App. 3d 38.) Furthermore, extradition is not a judicial inquiry into the merits of a charge. (*People v. Boswell* (1986), 148 Ill. App. 3d 915; *Beauchamp v. Elrod* (1985), 137 Ill. App. 3d 208.) "Because of the summary nature of extradition proceedings, the scope of inquiry surrounding extradition proceedings does not include the kind of preliminary inquiry traditionally intervening between initial arrest and trial." *Beauchamp*, 137 Ill. App. 3d at 210. See also *Michigan v. Doran* (1978), 439 U.S. 282, 288, 58 L. Ed. 2d 521, 527, 99 S. Ct. 530, 535.

Given the nature of the extradition process, we believe that the extradition hearing did not mark the beginning of adversary judicial proceedings, and therefore

was not a critical stage. As previously noted, extradition is not a judicial inquiry into the merits of a charge. The only constitutional right involved is that of personal liberty. Even though liberty is at stake, " 'the fact that a proceeding will result in loss of liberty does not *ipso facto* mean that the proceeding is a "criminal prosecution" for purposes of the Sixth Amendment. Nor does the fact that confinement will be imposed in the first instance as a result of that proceeding make it a "criminal prosecution" ' " thus transforming it to a critical stage for sixth amendment purposes. *Utt v. State* (1982), 293 Md. 271, 280, 443 A.2d 582, 586, quoting *Middendorf v. Henry* (1976), 425 U.S. 25, 37, 47 L. Ed. 2d 556, 566, 96 S. Ct. 1281, 1289.

Defendant, however, argues that the prosecution's involvement in the extradition process and the issuance of the fugitive warrant was sufficient for sixth amendment rights to attach. Our court has held that the level of prosecutorial involvement may be considered in determining when the sixth amendment right to counsel attaches. See, *e.g., People v. Hayes* (1990), 139 Ill. 2d 89; *People v. Wilson* (1987), 116 Ill. 2d 29; *People v. Owens* (1984), 102 Ill. 2d 88, 101.

For example, in *Hayes* this court held that one consideration in determining whether the filing of a criminal complaint triggers a defendant's sixth amendment right to counsel is the "degree to which the State's prosecutorial forces have focused upon the accused." (*Hayes,* 139 Ill. 2d at 125.) This is because the degree of prosecutorial involvement is relevant in determining whether the State has committed itself to prosecute and whether adverse positions have developed between the State and defendant. (*Hayes,* 139 Ill. 2d at 124, quoting *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 418, 92 S. Ct. 1877, 1882.) In *Hayes* the court held that because the prosecutor only reviewed the criminal com-

plaint there was insufficient prosecutorial involvement for defendant's sixth amendment right to counsel to attach. See also *Owens*, 102 Ill. 2d 88.

In *Wilson*, 116 Ill. 2d 29, this court held that the filing of a complaint by a police officer to obtain an arrest warrant does not trigger the sixth amendment right to counsel such that the defendant is denied his constitutional right to counsel at a lineup. There the court noted that the complaint was presented to the judge *ex parte* by a police officer, rather than a State's Attorney. Further, the complaint was filed after the defendant had appeared in the lineup.

In the instant case, the complaint was presented to the court not by a State's Attorney, but by a police officer. Moreover, the complaint was not filed until after the defendant had been extradited to Illinois.

The prosecution's involvement in the fugitive warrant, which was filed in the Wisconsin court along with the extradition papers, was similarly limited. A notation on the warrant indicates that it was approved by an assistant State's Attorney. Absent evidence of greater prosecutorial involvement, however, mere approval of a fugitive warrant by a State's Attorney is insufficient indication that the full prosecutorial forces of the State were directed at the defendant.

The prosecution's involvement in the extradition process is similarly insufficient for the defendant's sixth amendment right to counsel to have attached. Because extradition is only a summary procedure for returning a fugitive to the demanding State, we believe that at this point the State has not yet committed itself to prosecute the defendant nor have adversarial positions solidified between the government and defendant.

In support of his position that his sixth amendment right to counsel had attached, defendant cites *People v. Fleming* (1985), 134 Ill. App. 3d 562. In *Fleming* our ap-

406

pellate court held that defendant's right to counsel attached at the filing of a juvenile delinquency petition and an arrest warrant. (*Fleming*, 134 Ill. App. 3d at 569.) There, the court likened the delinquency petition to a criminal complaint. In the instant case, however, the criminal complaint, analogous to the delinquency petition in *Fleming*, was not filed until after the defendant had been extradited to Illinois. We therefore find *Fleming* unpersuasive.

Because the complaint for preliminary examination was not filed until after the defendant made the incriminating statements and because there is an insufficient showing of prosecutorial involvement, we hold that the defendant's sixth amendment right to counsel had not attached at the time he made the incriminating statements he sought to suppress.

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICES CLARK and FREEMAN took no part in the consideration or decision of this case.