# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,          :
                            :         ID No. 1508010489

         v.                 :         In and For Kent County

                            :

ABDUL T. WHITE,            :

                            :

        Defendant.       :

## OPINION

Submitted: February 14, 2017
Decided: May 8, 2017

Jason Cohee, Esquire, and Lindsay Taylor, Esquire, DEPARTMENT OF JUSTICE, Dover, Delaware, *for the State.*

Edward Gill, Esquire, LAW OFFICE OF EDWARD C. GILL P.A., and Alexander Funk, Esquire, CURLEY, DODGE & FUNK, LLC, Dover, Delaware, *Attorneys for Defendant.*

Clark, J.

# I. Introduction

On August 8, 2015, John Harmon (hereinafter "Mr. Harmon") was fatally shot in the head in Milford, Delaware. After a police investigation, the Milford Police Department (hereinafter the "police") suspected that Defendant Abdul White (hereinafter "Mr. White") was involved. The police sought and obtained several warrants including a search warrant for his DNA. The Philadelphia police located Mr. White while he was in Pennsylvania and detained him on a Fugitive of Justice charge. After his apprehension, Delaware police interrogated him in Philadelphia regarding the murder. After Pennsylvania extradited Mr. White to Delaware, the police again interviewed him in Milford. During the course of that interview, Mr. White made incriminating statements. Following Mr. White's discussion with the police, the police arrested him and charged him with Murder in the First Degree and several other offenses.

Mr. White has filed several motions to suppress. First, regarding an issue of first impression in Delaware, he argues that the Court must suppress any DNA evidence in the case because the search warrant affidavit did not represent that DNA was actually recovered from the scene. Accordingly, he argues that there is not the nexus required to justify the seizure of his DNA.

Second, Mr. White argues that the Court must suppress incriminating statements made during his Milford police interview for several reasons. These include his argument that the Milford police detective provided invalid *Miranda*[1] warnings to him both in Philadelphia and in Milford. Also, Mr. White argues that a twelve minute delay in providing the warnings occurred after the start of an interrogation, rendering the warnings invalid. Mr. White also argues that he formerly invoked his rights in writing by signing a non-waiver form in

---

[1] *Miranda v. Arizona*, 384 U.S. 486 (1966).

Philadelphia while represented by counsel on a Fugitive of Justice charge. He argues that the non-waiver form invoked his rights for his subsequent interrogation in Milford. Lastly, he requests the Court to suppress his incriminating statements in Milford because the police violated his Sixth Amendment right to counsel because he was represented in Philadelphia before his extradition to Delaware.

The State opposes Mr. White's motion arguing that the warrant for Mr. White's DNA contained a sufficient nexus to establish probable cause that seizing a sample of his DNA would provide evidence of his involvement. The State also maintains that the police provided Mr. White with valid *Miranda* warnings prior to the interrogations and that he knowingly and voluntarily waived his rights. Finally, the State argues that Mr. White's Sixth Amendment right to counsel had not yet attached to the Murder First Degree charge, and therefore, the police did not violate this constitutional right by questioning him in Milford without counsel. After considering the respective positions of the parties, Mr. White's motions to suppress (1) DNA evidence on the basis of a defective warrant, and (2) his statements pursuant to *Miranda* and the Sixth Amendment right to counsel are DENIED.

## II. Facts

All facts stated herein that are relevant to the motion to suppress DNA evidence are recited in the probable cause affidavit. Separately, all facts relevant to the motions to suppress Mr. White's statements are those facts found by the Court after the January 5, 2017 suppression hearing, and through documents supplementing that record.

On August 8, 2015, the police were notified of a home invasion in Milford. Three intruders wearing dark clothes and dirt bike style masks entered a home located at 515 Walnut Street in Milford. The intruders ordered nine people in the house to lay on the floor in the living room and then held them at gunpoint.

3

Another person was duct taped and also held at gunpoint in the living room. While two of the intruders held these people, one of the three intruders kept Mr. Harmon in his bedroom. The intruder duct taped Mr. Harmon to his wheelchair and then fatally shot him in the head. After arriving at the scene, the Milford police located an intruder's dirt bike mask in Mr. Harmon's bedroom. After processing the mask, the police found a latent fingerprint belonging to the left middle finger of Mr. White. Thereafter, a magistrate at the Justice of the Peace issued a search warrant for Mr. White's DNA.

After securing the warrant, the police unsuccessfully attempted to locate Mr. White. The Philadelphia police arrested him in Philadelphia, Pennsylvania on September 23, 2015 on a Fugitive of Justice charge and later extradited him to Delaware. During his detention in Pennsylvania, however, the Milford police read Mr. White his *Miranda* rights and interviewed him. Later, at some point prior to his extradition to Delaware, the Philadelphia Public Defender's office had Mr. White execute a written assertion of his *Miranda* rights, apparently in reference to the Pennsylvania charge.

Pennsylvania then extradited Mr. White to Delaware on December 2, 2015. While the police held Mr. White at the police station in Milford, Delaware, the same Milford detective spoke to him and asked if he wanted to continue a conversation he had with another police officer regarding separate charges. Without prompting, Mr. White then began talking about the home invasion and murder. At that point, the police interrupted Mr. White to again inform him of his *Miranda* rights. Mr. White then waived his rights and provided a six hour long incriminating statement to the police regarding the home invasion and murder. Following this interview, the police formerly charged Mr. White with various charges including Murder First Degree.

### III.   Discussion

Following Mr. White's arrest, his defense counsel filed several motions to suppress evidence.  The first motion to suppress focuses on the DNA search warrant, and the balance of Mr. White's motions focus on the incriminating statements he provided to the police.  For the reasons set forth below, Mr. White's several motions to suppress evidence are denied.

### A. The warrant for collection of Mr. White's DNA was valid.

Mr. White challenges the issuance of the search warrant authorizing the collection of his DNA by buccal swab.  Since this motion involves a search warrant, the burden is on Mr. White to prove that the collection of his DNA was unlawful.[2]  A judicial officer must only issue a search warrant if the government has established probable cause.[3]  The affidavit must set forth enough facts to allow the judicial officer to form a reasonable belief that a particular offense has been committed and that seizable property would be found in a particular location.[4]  Additionally, probable cause requires a nexus between the items sought by the police and the place in which the police wish to search.[5]  A warrant involving authorization for a DNA swab is evaluated pursuant to these same standards.

Mr. White must establish the illegality of this search and seizure by a preponderance of the evidence.[6]  Furthermore, a reviewing court must pay great

---

[2] *See State v. Sisson*, 883 A.2d 868, 875 (Del. Super. Ct. 2005) (stating that "[o]n a motion to suppress challenging the validity of a search warrant, the defendant bears the burden of establishing that the challenged search or seizure was unlawful").

[3] *Fink v. State*, 817 A.2d 781, 786 (Del. 2003).

[4] *Sisson v. State*, 903 A.2d 288, 296 (Del. 2006).

[5] *Hooks v. State*, 416 A.2d 189, 203 (Del. 1980).

[6] *Sission*, 883 A.2d at 875.

deference to a magistrate's decision that a warrant is supported by probable cause.[7] Notwithstanding this deference, the reviewing court's "'substantial basis' review requires [it] to determine whether 'the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances . . . .'"[8] The Court is confined to a four-corners analysis. Namely, the search warrant's affidavit "must, within the four-corners of the affidavit, set forth facts adequate for a judicial officer to form a reasonable belief that an offense has been committed and the property to be seized will be found in a particular place."[9]

Mr. White argues that the language found in the affidavit to support a collection of his DNA included merely conclusory statements that are insufficient to establish the required nexus between his DNA and other evidence of a crime. Here, the relevant information contained in the affidavit does not include a statement that the police recovered any DNA from the scene. It does, however, recite the affiant's belief that Mr. White's DNA would be located on various items of evidence collected at the scene of the crime. He further recites that it has been (1) the affiant's experience that those involved in committing crimes leave their DNA behind; and (2) when a person involved in committing a crime leaves items of clothing worn or used to commit the crime at the scene, those items often contain the suspect's DNA. Mr. White argues that these conclusory statements are insufficient to establish a nexus between Mr. White's DNA and the evidence found at the crime scene.

---

[7] *State v. Holden*, 60 A.3d 1110, 1114 (Del. 2013).

[8] *LeGrande v. State*, 947 A.2d 1103, 1108 (Del. 2008) (quoting *United States v. Leon*, 486 U.S. 897, 915 (1984)).

[9] *Sisson* 903 A.2d at 296.

In support of his argument, Mr. White points to *dicta* in the Superior Court's decision in *State v. Campbell* to argue that conclusory statements that DNA may be recovered from an item without adequate support for such statements is insufficient to establish a proper foundation for a seizure of a suspect's DNA.[10] Therefore, Mr. White argues that the Court must suppress the evidence obtained as a result of the DNA sample.

In response, the State argues that the statements in the affidavit establish a sufficient nexus to support probable cause because the affiant stated that in his experience people who commit crimes leave their DNA at the crime scene. Furthermore, it argues that when items of clothing are left behind at the scene, those items often contain DNA evidence. The State also relies upon *State v. Campbell* by referencing its *dicta* that a warrant's inclusion of a statement that based on the affiant's experience that it is likely that the intruders left DNA on these items, establishes the required nexus.[11]

During the evidentiary hearing, defense counsel for Mr. White clarified this argument acknowledging that the affidavit did include statements regarding the affiant's experience. However, Mr. White argues that the affidavit is still insufficient because it contains no information regarding why the affiant's experience justifies this conclusion. According to Mr. White, there must be further foundation to support the conclusion that based on the affiant's experience, training, or education, DNA is often left behind at the scene.

The State counters that affidavit recited that he had 13 years of experience investigating homicides, attempted homicides, and other serious assaults. The State argues that this is an adequate basis for the affiant's experience supporting the

---

[10] 2015 WL 5968901 (Del. Super. Ct. Oct. 5, 2015).

[11] *Id.*

7

belief that there would be DNA left at the crime scene. The State also maintains that the expectation of finding Mr. White's DNA on the dirt bike mask left behind at the crime scene was augmented when the police found a latent finger print on the mask which belonged to Mr. White. Accordingly, the State then advocates the *Campbell* decision's reasoning that an affidavit for DNA seizure would be sufficient if it relied on an affiant's training, experience, and education.[12]

Both parties represented during the evidentiary hearing that the only Delaware case discussing this issue is *State v. Campbell*. While instructive and persuasive, *Campbell*'s relevant analysis is *dicta*. In that case, there was in fact no DNA evidence recovered at that crime scene, making this Court's review of the case at hand a matter of first impression in Delaware.

In *Campbell*, police obtained a search warrant for the defendant's DNA.[13] The only DNA specific information contained in that warrant included

> [y]our affiant is aware that several casings from the firearm that was fired were located at the scene and collected as evidence, [and] [y]our affiant is aware that it is possible to collect DNA evidence of the suspect(s) from the casings. Your affiant is aware that DNA belonging to Keith Campbell 8/3/1988 can be compared to any DNA found on the casings.[14]

The court in *Campbell* acknowledged that there was no evidence recited that the shell casings would contain DNA to compare against the collected DNA.[15] The affiant merely stated that he was aware that it would be possible to recover DNA

---

[12] *Id.*

[13] *Id.* at 1.

[14] *Id.* at 4.

[15] *Id.*

from a shell casing without providing support for this conclusion.[16]  Notably, the court in *Campbell* was concerned by the fact that the statement that DNA could be collected from shell casings was "not supported by the detective's personal knowledge gained from work experience or other investigations that may have occurred or [was] even based on specific training or education."[17]

In further discussing the issue, the court in *Campbell* acknowledged that many jurisdictions have held that without "law enforcement recovery of a comparison sample of DNA, a DNA swab search warrant is unsupported by probable cause."[18]  However, the *Campbell* decision, without discussing persuasive authority rejecting this approach, merely rejected it because it "goes too far".[19]  The court based its reasoning on practical concerns.  Namely, it wrote that determining whether DNA is present on an object can be difficult and time consuming, and requiring a comparison with DNA found at the crime scene is too burdensome on law enforcement.[20]  Relevant to the case at hand, the court in *Campbell* further discussed that "[a]t a minimum, the assertions made in the affidavit must be supported by training, education, or experience that would

---

[16] *Id.*

[17] *Id.*

[18] *Id.  See Hindman v. United States*, 2015 WL 4390009, at *2 (N.D. Ala. July 15, 2015) (holding that in order to establish probable cause for DNA, "the government must possess a testable DNA sample sufficiently linked to the subject crime, which might then be compared to the suspect's sample to attempt to establish a 'match'"); *United States v. Robinson*, 2011 WL 7563020, at *5 (D. Minn. Dec. 2, 2011) report and recommendation adopted, 2012 WL 948670 (D. Minn. Mar. 20, 2012) (recommending that probable cause has not been established for the defendant's DNA because the government has not shown that DNA evidence on the firearm exists to compare against defendant's DNA); *United States v. Pakala*, 329 F.Supp.2d 178, 181 (D. Mass. 2004) (holding that the defendant cannot be subjected to a buccal swab until the government has determined whether the firearm contains a sufficient DNA profile in which to compare it to); *State v. Turnbull*, 61 V.I. 46, 54-55 (V.I. Super. Ct. 2014) (holding that absent a DNA sample to compare defendant's to, a search warrant lacks probable cause).

[19] *Campbell*, 2015 WL 5968901, at *5.

[20] *Id.* at 5.

reasonably justify and explain the detective's conclusion that DNA could reasonably be recovered from the particular object."[21]

This Court does not accept the approach that a finding of probable cause should be automatically rejected on nexus grounds if the police do not recite in the affidavit that they have recovered a DNA sample from the crime scene to compare with a DNA sample sought from a suspect. After examining a string of authority in other jurisdictions not finding such a litmus test, this Court agrees with the *dicta* in the *Campbell* discussion.[22] What is required for a showing of such a nexus is that there is a **fair probability** that the seized sample of DNA can be linked to a crime. Due to the nature of DNA recovery and analysis, requiring a known sample to compare Mr. White's DNA at the time of the issuance of a warrant would be too burdensome of a requirement. Moreover, such a bright line rule would not comport with the standard Delaware courts employ when reviewing a search warrant. These include reviewing warrants for sufficiency based on the totality of the circumstances and common sense. Accordingly, the fact that the police had not yet developed a comparison DNA sample found at the crime scene at the time of

---

[21] *Id.*

[22] *See e.g.*, *United States v. Hudson*, 2014 WL 4348241, at * 3 (D. Minn. Sept. 2, 2014) (holding that the totality of circumstances justified the issuance of a warrant for defendant's DNA because "[t]here was probable cause to believe that Defendant's DNA would provide evidence of a crime" after the warrant set forth that Defendant was arrested for drug use "and firearms had been inferentially connected to Defendant through observation of him arriving at and leaving from the location from which the firearms were recovered along with heroin"); *Mincey v. State*, 774 S.E.2d 752, 754 (Ga. Ct. App. 2015) (holding that a sample of DNA found at the scene was not required to issue a search warrant when information in the warrant made it possible that the police would find DNA evidence); *State v. Sharp*, 2014 WL 3558020, at *3 (Minn. Ct. App. Sept. 24, 2014) (holding that the totality of the circumstances established a fair probability that the police would find defendant's DNA on the firearm; the fact that it was possible that the evidence did not exist did not diminish this); *Wilson v. State*, 752 A.2d 1250, 1264–65 (Md. Ct. Spec. App. 2000) (holding that the warrant for the defendant's blood sample was supported by probable cause based on eyewitnesses describing the defendant and his apparel in detail linking him to the kidnapping).

the issuance of the warrant is not fatal to the probable cause determination, provided there is a fair probability that such evidence exists.

Here, the affiant included information that based on his experience investigating homicides, DNA is often left behind at crime scenes and that when perpetrators leave behind items they wore during the commission of the crime, those items can contain DNA. The affiant also stated that he believed Mr. White's DNA would be found on the evidence collected at the scene.

Moreover, in the affidavit, the affiant explained that a dirt bike mask was left behind and that after processing that mask, the police found a finger print. The police were able to match that finger print to Mr. White. In evaluating the facts recited in the affidavit, under the totality of the circumstances and employing the required deference to the issuing magistrate and a common sense review, there was a fair probability that DNA from hair or other matter would be discovered on the dirt bike mask. In fact, in this case the facts support the link to an even greater degree because a dirt bike mask, under common and ordinary understanding, is a tightfitting article of headgear that would be more likely to retain hair or other DNA. This information, in total, was sufficient to allow the issuing magistrate to reasonably believe that there was a fair probability that the police would find Mr. White's DNA on evidence found at the crime scene. Under the totality of the circumstances, and employing the appropriate deferential review, the Court holds that the warrant for Mr. White's DNA established a sufficient nexus, and was properly supported by probable cause.

While the Court finds the warrant sufficient to justify the taking of Mr. White's DNA, the State raised two alternative justifications. During the evidentiary hearing, the State argued that the independent source doctrine and a search incident

11

to arrest justified the seizure of his DNA.[23]  The parties provided supplemental briefing on the issue of DNA seizure incident to arrests.  The State maintains that if the Court were to find the search warrant to be invalid, the seizure of Mr. White's DNA would still be constitutional because the police performed the buccal swab pursuant to a search incident to arrest.

The parties aptly argued the issue of whether, under Delaware law both statutory and Constitutional, a buccal swab taken close to the time of arrest, incident to the arrest, would fall under such an exception.  Since the warrant lawfully provided for a swab of Mr. White, the Court will not further address either the independent source or the search incident to arrest doctrine.

## B. The Miranda warnings given to Mr. White were not ambiguous despite the detective's addition to the warnings.

Mr. White's second motion argues that he did not properly waive his *Miranda* rights while questioned in Philadelphia by the Milford detective.  He further argues that after he was extradited to Delaware, police questioning in Milford violated the requirements of *Miranda* because the same detective misstated those rights in the exact same way.  Therefore, Mr. White maintains that he could not validly waive his Miranda rights because he did not understand those rights.

The State disagrees with Mr. White and argues that the Milford detective in Pennsylvania properly *Mirandized* Mr. White and that he waived those rights.  The

---

[23] The State initially argued that a sample it collected of Mr. White's DNA pursuant to 29 *Del. C.* § 4713 constituted an independent source.  However, after the evidentiary hearing, in its supplemental briefing, the State withdrew its independent source argument.  Therefore, the Court declines to rule separately on the admissibility of a sample maintained in this data base, or the admissibility of the results of any comparison that may involve that sample.

State also argues that Mr. White was properly *Mirandized* once again in Milford where he again waived those rights.

After testimony at the suppression hearing, Mr. White filed supplemental material arguing that the *Miranda* warnings given by the detective both at the Milford police station and in Philadelphia included an inappropriate qualification to when his right to counsel attached. He also argues that this additional language made the warning unclear and thus constitutionally deficient.

In support of this argument, Mr. White relies on a Washington Supreme Court decision, *State v. Mayer,* where that court determined that a *Miranda* warning followed by an explanation of the timing of the right to counsel was ambiguous because it made the timing of the availability for appointment of counsel unclear.[24] The Washington Supreme Court held that waiver of *Miranda* rights is not knowing and voluntary when the police provide such an ambiguous warning.[25] Mr. White also relies on the United States Supreme Court decision in *California v. Prysock*.[26] In *Prysock*, the Court acknowledged that if the right to counsel is qualified as attaching only at some future point in the process, it is an invalid *Miranda* warning.[27]

---

[24] *State v. Mayer*, 362 P.3d 745, 752 (Wash. 2015). The initial warning in this case was the standard *Miranda* warning. *Id.* at 747. However, the defendant then asked the detective what would happen if he wanted a lawyer but could not afford one. *Id.* The detective responded that if he was "charged with a crime and arrested" the court would appoint him an attorney. *Id.* The defendant asked another follow up question about how the appointment would work to which the detective responded, "[y]ou're not under arrest at this point . . . [.]" *Id.* The detective then stated that if he were under arrest he would be taken to jail and then would go before a judge who would inquire about whether he could afford an attorney. *Id.* at 747–48. After this explanation, the defendant waived his *Miranda* rights and made an incriminating statement to the detective. *Id.* at 748.

[25] *Id.* at 754.

[26] *California v. Prysock*, 453 U.S. 355 (1981).

[27] *Id.* at 360.

13

The State counters that the detective informed Mr. White of all four of his *Miranda* rights. He was informed that he had the right to remain silent, that anything he said could be used against him in a court of law, that he had the right to have counsel present, and that if he could not afford an attorney one would be provided. The State further notes that the United States Supreme Court has never required the *Miranda* warnings to be given in a specific manner.[28] Instead, the State argues that in order to comply with *Miranda*, the police must "reasonably 'conve[y] to [a suspect] his rights as required by *Miranda.*'"[29]

The State relies principally on the United States Supreme Court decisions in *Duckworth v. Eagan*[30] and *Florida v. Powell*.[31] In both cases, the United States Supreme Court examined variations of *Miranda* warnings, and in both cases, held the *Miranda* warnings were valid because the police informed the defendants of the required rights.[32] The State also argues that the added statement by the detective did not tie the right to counsel until a future point in time. Accordingly, it argues that the *Miranda* warnings provided to Mr. White by the police were sufficient.

The Court finds that the same alleged insufficiency was included by the Milford detective in the *Miranda* warnings in both the Philadelphia and Milford interviews. Accordingly, a parallel analysis of their sufficiency is appropriate.

---

[28] *Duckworth v. Eagan*, 492 U.S. 195, 202–03 (1989).

[29] *Id.* at 203 (quoting *Prysock*, 453 U.S. at 361).

[30] 429 U.S. 195 (1989).

[31] 559 U.S. 50 (2010).

[32] *Duckworth*, 429 U.S. at 203; *Powell* 559 U.S. at 62.

Delaware has adopted a two-part test, established in *Moran v. Burbine*,[33] to assess a suspect's waiver of his *Miranda* rights.[34] The two-part test states

> [f]irst the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.[35]

The burden is on the state to show "by a preponderance of the evidence that the suspect's *Miranda* rights have been waived."[36]

At the outset, Mr. White advanced a cursory argument that Mr. White's statement was involuntary because the detective informed him that his cooperation would be helpful for him. Such a statement does not make Mr. White's waiver involuntary because it was not sufficient to overbear Mr. White's will and rational thinking process.[37] Based on the totality of the circumstances, this one vague statement by the detective did not make Mr. White's waiver involuntary. After reviewing the videotaped statement, the detective's behavior did not evidence an attempt to be intimidating or coercive. Furthermore, Mr. White did not react to this statement in any noticeable way that evidences that he felt intimidated or coerced. Therefore, Mr. White's waiver was voluntary.

---

[33] 475 U.S. 412 (1986).

[34] *Hubbard v. State*, 16 A.3d 912, 917 (Del. 2011).

[35] *Id.* (quoting *Moran*, 475 U.S. at 421).

[36] *Id.*

[37] *See Alston v. State*, 554 A.2d 304, 307 (Del. 1989) (stating that "[p]romises or inducements . . . do not make a statement involuntary, unless so extravagant, or so impressionable as to overbear the person's will and rational thinking process").

While the Court finds Mr. White's waiver to be voluntary, his argument primarily focuses on the second prong of the two-part test for a valid waiver. Mr. White argues that additional language the police included in the *Miranda* warning made his rights unclear, and therefore, he argues that he did not fully understand his rights. In order to knowingly waive *Miranda* rights, the suspect "must comprehend the 'plain meaning of his basic *Miranda* rights.'"[38] In making this determination, a court is to look to the totality of the circumstances, "including 'the behavior of the interrogators, the conduct of the defendant, his age, his intellect, his experience, and all other pertinent factors.'"[39]

> The detective informed Mr. White that
>
> you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to consult with an attorney and have an attorney present during questioning. If you cannot afford an attorney, one will be provided to you for questioning at no cost. *If at any time you wish to answer any questions you can stop and request an attorney, okay?* Um do you understand these rights? (emphasis added).

Here, the Court finds that the *Miranda* warnings were sufficient, as the police informed Mr. White of his four *Miranda* rights. The Delaware Supreme Court, in citing the United States Supreme Court, has held that the *Miranda* warnings "do[] not have to be stated exactly as it is written in the *Miranda* opinion."[40] However, law enforcement officials must convey the complete substance of *Miranda*'s safeguard to a suspect."[41] Here, the detective clearly informed Mr. White of the four *Miranda* rights.

---

[38] *Hubbard*, 16 A.3d at 917 (quoting *Bennett v. State*, 922 A.2d 1236, 2010 WL 987025, at *3 (Del. Mar. 18, 2010) (Table)).

[39] *Id.* (quoting *Whalen v. State*, 434 A.2d 1346, 1351 (Del. 1981)).

[40] *Id.* at 918.

[41] *Id.*

The Court recognizes that the detective included additional language when he said "[i]f at any time you wish to answer any questions you can stop and request an attorney, okay?" This added language, while not particularly helpful, does not render the balance of the statement of rights confusing. While other jurisdictions have determined additional language can make the *Miranda* warnings unclear and therefore invalid,[42] this additional statement did not make the warnings unclear.

The Court disagrees with Mr. White's argument that the circumstances here are similar to the *Meyer* case in Washington where a detective's clarification made the warning ambiguous. Instead, the additional language provided by the Milford detective is similar to the *Miranda* warning given in *Florida v. Powell* where the detective stated

> [y]ou have the right to remain silent. If you give up the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview.[43]

In *Powell*, the Court determined the *Miranda* warnings were valid because the police officers "did not 'entirely omi[t]' any information *Miranda* required them to impart."[44] Similarly here, the officer did not omit any information *Miranda* required.

Furthermore, while *Miranda* warnings that tie the right to counsel to a point in the future are invalid,[45] the warning at issue here did not create a condition

---

[42] *See State v. Mayer*, 362 P.3d 745, 752 (Wash. 2015) (holding that a defendant's waiver was invalid because the *Miranda* warning was unclear); *State v. Crisler*, 438 N.W.2d 670, 672 (Minn. 1989) (cautioning that "a cryptic or paraphrased warning that deviates from the standard" can be held to be inadequate).

[43] *Florida v. Powell*, 559 U.S. 50, 54 (2010).

[44] *Id.* at 62.

[45] *California v. Prysock*, 453 U.S. 355, 360 (1981).

17

precedent for the right to counsel. In *Duckworth v. Eagan*, the Court upheld a *Miranda* warning that stated, in relevant part,

> [y]ou have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer.[46]

Despite the "if and when you got to court" statement, the Court determined that the defendant's right to counsel was not tied to a future point in time.[47] Instead, the Court determined that the warnings reasonably conveyed his rights because the warning "touched all of the bases required by *Miranda*."[48] Here too, the warning the detective provided to Mr. White touched all the bases required by *Miranda* and as such reasonably conveyed to him his rights. The right to an attorney was not conditioned on him answering questions first. It merely informs Mr. White that he did not lose his right to an attorney if he began answering questions without the presence of an attorney.

Accordingly, Mr. White's argument that he was unable to understand the plain meaning of his *Miranda* rights is without merit. Furthermore, after having received a proper *Miranda* warning, Mr. White, when asked if he understood his rights, stated that he did. The detective then asked Mr. White, "with these rights in mind, do you wish to speak to me now" to which Mr. White responded affirmatively. Additionally, Mr. White, at the time of the interview, was 31 years old and has had experience with the criminal justice system. Based on the fact that

---

[46] *Ducksworth v. Eagan*, 492 U.S. 195, 198 (1989).

[47] *Id.* at 203–04.

[48] *Id.* at 203.

the police provided a proper *Miranda* warning and based on Mr. White's age and experience with the justice system, the Court finds that he knowingly waived his *Miranda* rights. As the Court finds Mr. White's waiver, under the totality of the circumstances, to be both knowing and voluntary, the Court will not suppress the statements he provided to the police.

**C. During the Milford interrogation, the twelve minute delay in re-Mirandizing Mr. White did not violate his rights.**

Mr. White also seeks suppression of his six hour interview in Milford because there was a twelve minute delay before the police read him his *Miranda* rights. Accordingly, the State must establish by a preponderance of the evidence that this "statement was not the product of custodial interrogation conducted in the absence of *Miranda* warnings."[49] However, both the United States Supreme Court and the Delaware Supreme Court have held that the *Miranda* warnings are only required "when police *interrogate* a suspect in a custodial setting."[50] The Delaware Supreme Court has adopted the approach taken by the United States Supreme Court in determining when an interrogation has occurred by defining interrogation to include actual questioning and its functional equivalent.[51] The functional equivalent "includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"[52]

---

[49] *United States v. Cordero*, 31 F.Supp.3d 641, 648–49 (D. Del. 2014).

[50] *E.g.*, *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980); *Tolson v. State*, 900 A.2d 639, 643 (Del. 2006).

[51] *Tolson*, 900 A.2d at 643.

[52] *Id.* at 643–44.

In this regard, "[a]n interrogation only encompasses actions or words by the officer that he or she should have known would elicit an incriminating response."[53]

Here, the issue is whether, in the twelve minutes before the detective read Mr. White his *Miranda* warnings, the interaction amounted to an interrogation or its functional equivalent, making it unlawful for the police to not provide the *Miranda* warnings at the outset. The police officer began the interview by stating

> you spoke to a, uh, a sergeant from Delaware State Police it seems a day or two after you and I talked. And it was about a totally different case. So he's here now and um, he's wondering if you guys can continue your conversation. It has nothing to do with, with our case, but obviously it could probably help go a long way with the prosecutor.[54]

Asking a yes or no question regarding whether the suspect wants to continue talking to a different police officer about an unrelated case is not something that an officer should have known would elicit an incriminating response. The detective merely asked whether Mr. White wished to talk to a different officer about a different crime. This interaction did not amount to an interrogation.

After the Court's review of the video and the transcript of this statement, it finds that Mr. White's statements relevant to the murder investigation during the beginning twelve minutes were not in response to police questioning or its functional equivalent. Promptly upon Mr. White's unsolicited shift of the conversation, the detective re-*Mirandized* him. Consequently, the police did not violate Mr. White's rights.

---

[53] *Id.* at 644.

[54] Court Ex. 2 at 1.

**D. The non-waiver form provided by defense counsel did not invalidate Mr. White's waiver of the *Miranda* rights administered during the questioning in Milford.**

After the suppression hearing, Mr. White filed a motion to expand the suppression record and presented the Court, *inter alia*, with a non-waiver form that he signed in Philadelphia on October 16, 2015. The Court has accepted and considered Mr. White's additional documentary submissions as part of the suppression record. The non-waiver form stated that he does not wish to be questioned without counsel present, he wishes to remain silent, and that he will not waive these rights without the presence of an attorney. Based on this non-waiver form signed after the Philadelphia interview with the Milford detective, Mr. White argues that he did not waive his *Miranda* rights in Milford.

In response, the State argues that neither it nor the police were aware of this form. Therefore, according to the State, given Mr. White's valid waiver during the interrogation, the non-waiver form does not provide a ground to suppress his statement.

Mr. White then filed a response to the State's reply in which he argued that there was no evidence that the State did not have knowledge of this form. He further argued that the public defender that instructed Mr. White to sign this form would have made the existence of it known to the Delaware authorities, and failing to do so would have amounted to ineffective assistance of counsel.

The Delaware Supreme Court has confronted the effect of a non-waiver form in *Alston v. State*.[55] There, the defendant, while detained at Gander Hill, signed a similar form.[56] In *Alston*, the defendant retained a copy of the form, the

---

[55] 554 A.2d 304 (Del. 1989).

[56] *Id.* at 306.

21

public defender retained a copy, and a third copy was placed in the defendant's file at the public defender's office located in Gander Hill for the Warden's review.[57] The defendant was later transported to the Wilmington police department where he was re-*Mirandized*.[58]   However, during the course of this police interview, the defendant waived his *Miranda* rights and confessed.[59]   Defendant's counsel attempted to suppress this confession on the basis of the non-waiver form.[60]   In deciding the *Alston* case, the Court stated that while a suspect can invoke his right to counsel in a variety of ways, invocation of this right must be conveyed to someone who would seek to question him.[61]   The Court determined that signing a non-waiver form was not a valid invocation of his rights because there was no evidence that any state actor questioning him had knowledge of the form's existence.[62]   Not only were the police officers unaware of the form's existence, but the defendant did not inform them that he had signed anything that invoked his rights.[63]   The Court accordingly refused to impute knowledge of this form to the police officers based solely on the fact that it was accessible to other state agents through his file at the public defender's office in Gander Hill.[64]

The *Alston* case controls here, particularly since the case at hand is even clearer than *Alston*.   The State represents that it was unaware of this form. Moreover, Mr. White provided no evidence that the police or the State were aware

---

[57] *Id.*

[58] *Id.* at 307.

[59] *Id.*

[60] *Id.*

[61] *Id.* at 309–10.

[62] *Id.* at 310.

[63] *Id.*

[64] *Id.*

of the existence of this non-waiver form prior to the Milford interrogation.[65] After the suppression hearing, Mr. White's counsel obtained a copy of this form through the public defender's office in Philadelphia. As Mr. White executed the form in Philadelphia and a Pennsylvania public defender signed it, it is not reasonable to impute knowledge to the Milford police officers without evidence that the State of Delaware or any of its agents actually had knowledge of this form.[66]

Finally, Mr. White did not inform the detective that he had executed a non-waiver form or that he invoked his rights to anyone that would seek to question him. Instead, when the police questioned him in Milford, he was re-*Mirandized*

---

[65] Mr. White, during the evidentiary hearing, raised a concern regarding a potential *Brady* violation for the State's alleged failure to produce this form. During the evidentiary hearing, Mr. White had the opportunity to create a record regarding his *Brady* violation claim. However, he failed to do so. During the evidentiary hearing, he merely stated that he did not have paperwork regarding the extradition. Mr. White renewed the issue of a *Brady* violation in a response to the State's reply to his motion to expand the suppression record. In his response, he merely alleges that "the State has not provided any information, including police reports or notes, regarding this information which clearly should have been provided to the defense as *Brady* material . . ." When making a *Brady* violation claim, the defendant is required to show that: "(1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the State; and (3) its suppression prejudices the defendant." *Liu v. State*, 103 A.3d 515, 2014 WL 5460431, at *1 (Del. Oct. 27, 2014) (Table). Mr. White has failed to establish that the State suppressed this form or that he was prejudiced because his counsel ultimately obtained it for him. Accordingly, his *Brady* violation allegation is unsupported. A *Brady* violation claim, however, can be raised at any time during the proceedings. Super. Ct. Crim. R. 16(d). Accordingly, Mr. White would not be barred from revisiting this issue if he can file a motion that satisfies the three required elements. In any event, at Mr. White's request to supplement the suppression record, the Court has considered the document for purposes of this motion, making the alleged prejudice unclear.

[66] Other jurisdictions have also addressed the issue of a defendant invoking his rights in one jurisdiction and then being transported and interrogated in another jurisdiction. Those cases have held that it is a valid invocation of rights only when the second jurisdiction had actual knowledge of the invocation. *Compare People v. Young*, 558 N.E.2d 1287, 1292 (Ill. App. Ct. 1990) (holding that when the defendant invoked his rights for the present and future in Wisconsin, this invocation was insufficient to invoke his rights after he was extradited to Illinois because there was no evidence that the Illinois authorities had knowledge of this invocation) *with People v. Bates*, 478 N.E.2d 1106, 1107 (Ill. App. Ct. 1985) (holding that defendant's invocation of his rights in Iowa was a sufficient invocation of his rights in Illinois because the police file in Illinois contained a note that defendant had refused to talk to the police in Iowa).

and agreed to waive his rights, and to talk to police. As the form in *Alston* was not a valid invocation of the defendant's rights, here too, the non-waiver form was not a valid invocation of Mr. White's rights. Despite Mr. White's argument that it is incomprehensible for an attorney to have a client sign such a form and then not inform authorities of its existence, such a scenario has previously occurred in Delaware and the Delaware Supreme Court has declined to impute an invocation of these rights.[67] The Court cannot properly assume that a public defender in Pennsylvania provided Delaware authorities with a copy of this form or even informed them of its existence.

### E. The police did not violate Mr. White's Sixth Amendment right to counsel.

Mr. White's final argument is that the police violated his Sixth Amendment right to counsel. Mr. White was arrested in Philadelphia as a fugitive on September 23, 2015. He argues that his Sixth Amendment right to counsel attached to his Fugitive of Justice charge when he was arraigned in Pennsylvania on that charge and Pennsylvania provided him with a public defender. Mr. White argues that because he was appointed counsel for that charge pursuant to his Sixth Amendment right, the police violated his constitutional right when they interrogated him in Milford regarding the homicide. He asks this Court to follow an overturned United States Supreme Court decision, *Michigan v. Jackson*, which held that a defendant could not waive his rights regarding subsequent prosecutions without counsel present, once counsel had been appointed.[68] When raising this argument, Mr. White candidly disclosed that the United States Supreme Court

---

[67] *Alston*, 554 A.2d at 306–307, 310.

[68] 475 U.S. 625 (1986).

overruled *Jackson* in *Montejo v. Louisiana* which held that a review of a Sixth Amendment waiver must be made on a case-by-case basis.[69] Nevertheless, Mr. White argues that this Court should follow *Michigan v. Jackson*.

The State argues that Mr. White's argument is flawed because the Sixth Amendment right to counsel is offense specific and is triggered at the earliest, at the time of arrest for the charge. Therefore, Mr. White did not have any Sixth Amendment right to counsel, at that point, regarding the non-existent murder charge. Furthermore, the State argues that Delaware courts should follow the approach of *Montejo v. Louisiana* instead of *Michigan v. Jackson*.

After reviewing both parties' contentions, this Court finds it unnecessary to reach a conclusion as to whether Delaware courts should follow the *Montejo* or *Jackson* approach when reviewing a waiver of a suspect's Sixth Amendment right to counsel. In *Montejo* and *Jackson* the suspects all made incriminating statements after their Sixth Amendment right to counsel had attached for the crime in which they made those incriminating statements. Here, Mr. White made an incriminating statement regarding a crime where his Sixth Amendment right had not yet attached.

The Sixth Amendment right to counsel entitles a defendant to a lawyer "at or after the time that adversary judicial proceedings have been initiated against him."[70] Accordingly, this right is triggered when the police formally charge a suspect, a preliminary hearing is conducted, the government indicts the person, or there is an arraignment.[71] Therefore, because Mr. White was arraigned on the Fugitive of Justice charge, it is clear that he had a Sixth Amendment right to counsel on that specific charge. However, at the time of his statement, the

---

[69] 556 U.S. 778, 797 (2009).

[70] *Deputy v. State*, 500 A.2d 581, 589 (Del. 1985).

[71] *Id.* at 590.

25

homicide was still under investigation. The police had not formally charged Mr. White, he had not been arraigned, there was no preliminary hearing, nor was he indicted.[72] Accordingly, his Sixth Amendment right to counsel had not yet attached to the subsequent charge.

Mr. White's right to counsel under the Sixth Amendment for the Fugitive of Justice charge did not create a right to counsel under the Sixth Amendment on the murder charge because a suspect's right to counsel pursuant to the Sixth Amendment is offense specific.[73] A suspect cannot invoke the Sixth Amendment "for all future prosecutions, for it does not attach until a prosecution is commenced."[74] When Mr. White made the incriminating statement regarding the homicide, it was at a time when his Sixth Amendment right to counsel had not yet attached for the Murder First Degree charge. Furthermore, when a suspect makes an incriminating statement regarding a separate crime after the Sixth Amendment right to counsel has attached for a different crime, such a statement is admissible at trial.[75] Accordingly, the incriminating statement is admissible.

---

[72] While the Delaware Supreme Court has not addressed whether a warrant for arrest is an adversary judicial proceeding that entitles a defendant to the Sixth Amendment right to counsel, this Court finds persuasive the Delaware Superior Court's decision in *State v. Cabrera*. 2000 WL 33113956 (Del. Super. Ct. Dec. 19, 2000). There, the court found that issuance and execution of an arrest precedes the start of the adversary judicial proceeding that triggers the Sixth Amendment right to counsel. *Id.* at 17. The court reached this conclusion after examining United States Supreme Court decisions which find, in *dicta*, that an arrest warrant does not trigger Sixth Amendment rights. *Id.* at 16 –17.

[73] *McNeil v. Wisconsin*, 501 U.S. 171, 174 (1991); *Jackson v. State*, 643 A.2d 1360, 1372 (Del. 1994) (quoting *McNeil*, 501 U.S. at 174).

[74] *McNeil*, 501 U.S. at 174.

[75] *Jackson v. State*, 643 A.2d at 1372.

## IV. Conclusion

For the reasons set forth above, the search warrant for Mr. White's DNA was valid. Furthermore, the police provided Mr. White with proper *Miranda* warnings, both in Philadelphia and again in Milford, which he knowingly and voluntarily waived on both occasions. Furthermore, the non-waiver form was not a valid invocation of his rights, since there is no evidence that it was known to the State or its actors. Moreover, Mr. White did not have a Sixth Amendment right to counsel when he made incriminating statements regarding the murder, and therefore, the police did not violate this right when they questioned him. Accordingly, Mr. White's motions are DENIED.